**Dan MARCHI, Plaintiff–Appellant,**

v.

**BOARD OF COOPERATIVE EDUCATIONAL SERVICES OF ALBANY, Schoharie, Schenectady, and Saratoga Counties, Defendant–Appellee.**

No. 98–7213.

United States Court of Appeals, Second Circuit.

Heard Oct. 21, 1998.

Decided April 2, 1999.

Thomas Marcelle, Slingerland, N.Y., for plaintiff-appellant.

Leslie B. Neustadt, Maynard, O'Connor, Smith, & Caralinotto, Albany, N.Y., for defendant-appellee.

BEFORE: NEWMAN and JACOB, Circuit Judges, and TSOUCALAS,* Judge.

JON O. NEWMAN, Circuit Judge.

This appeal concerns the tension between two constitutional principles—separation of church and state and the free exercise of religion—in the context of public education. Specifically, we must decide whether a school board's attempt to avoid Establishment Clause violations by restricting the religious expression of one of its teachers infringes that teacher's free exercise rights. Dan Marchi appeals from the January 23, 1998, judgment of the District Court for the Northern District of New York (Frederick J. Scullin, Jr., District Judge) to the extent that it granted summary judgment to the Board of Cooperative Educational Services ("BOCES") and dismissed Marchi's claim that a BOCES directive, ordering Marchi to refrain from using religious references in the

delivery of his instructional program, is unconstitutionally vague and overbroad. In addition, Marchi challenges the denial of his motion for leave to amend his complaint. We conclude that the challenged directive is neither vague nor overbroad, and that Marchi's proposed amended complaint failed to set forth claims ripe for judicial review. Accordingly, we affirm.

Background

Marchi is a certified special education teacher who has taught socially and emotionally disturbed high school students since 1977. BOCES is a regional voluntary cooperative association of school districts with responsibility for the administration of special educational programs. In 1989, Marchi alleges that he underwent a dramatic conversion to Christianity. He acknowledges that he shared this experience with his students and that, in the fall of 1991, he modified his instructional program to discuss topics such as forgiveness, reconciliation, and God. See Complaint ¶¶ 17, 19, 22.

On September 14, 1994, John Daly, the Director of Special Education at BOCES, issued a "cease and desist" letter, directing Marchi to refrain from using religion as part of his instructional program. The letter stated:

During our meeting last week, we discussed your frequent references to religion while dealing with students. As you know, public schools are prohibited from offering instruction in support of religious beliefs or practices. Your personal beliefs about the role of religion in our society and its value to families and their children cannot be a part of the instruction given to your students.

Consequently, you are to cease and desist from using any references to religion in the delivery of your instructional program unless it is a required element of a course of instruction for your stu-

* Honorable Nicholas Tsoucalas, of the United States Court of International Trade, sitting by designation.

dents and has prior approval by your supervisor, Dr. DiPierro. I am sure that you realize the seriousness of this matter and will comply with this direction.

Marchi refused to abide by the directive because, in his view, to do so "would be detrimental to his students" and "would violate his conscience before God." Complaint ¶ 34. After a teaching assistant informed BOCES that Marchi was continuing to use religious themes and materials in the course of his teaching, BOCES charged Marchi in March of 1995 with insubordination and "conduct unbecoming a teacher." The following month, Marchi was suspended indefinitely for violating the directive. A hearing on the charges was held before a state Department of Education hearing officer in July of 1995. The hearing officer found that Marchi had committed an act of insubordination and imposed a penalty of six months' suspension. Marchi's return to teaching was conditioned on his commitment, in a written affirmation, to adhere to the directive. Upon advice of counsel, Marchi affirmed that he would adhere to the directive.

On the same day that Marchi signed the affirmation, he sent a letter to Daly asking for clarification of the directive. Specifically, he asked if private prayer with a student, at the student's request, was permitted, and if he could respond to students' questions concerning religion. Daly responded as follows:

> As a condition of returning to work, you signed an affirmation committing yourself not to use any references to religion in the delivery of your instructional program unless it is a required element of an approved course of instruction and you obtain the prior approval of your supervisor.

> Based upon the fact that the disciplinary action against you resulted from your defiance of an identical directive rather than a misunderstanding, together with the fact that you had the opportunity to consult with counsel before you

signed the affirmation, I must assume that you fully understood the terms of your affirmation and that you will abide by them.

On his return to work in January of 1996, Marchi was reassigned to a Comprehensive Development Skills ("CDS") class. The students in CDS classes, who are autistic or mentally handicapped, have little or no communication skills. Shortly after Marchi resumed teaching, a teacher's aide saw a letter from Marchi to Paul Czech, the father of Ryan Czech, a student in Marchi's CDS class. Mr. Czech had sent an audiotape of religious music to school in Ryan's lunch box, along with a note stating that the music calmed Ryan. In response, Marchi wrote:

> Ryan had a good day today. I thank you and the LORD for the tape[;] it brings the Spirit of Peace to the classroom. Tomorrow is a teacher's conference and dismissal is at 11:30. May God Bless you all richly!

After learning of the letter, Dr. DiPierro, Marchi's supervisor, met with Marchi. Marchi indicated that because the letter was written to a parent, he did not consider it to be part of his "instructional program," and thus regarded it as outside the directive's reach. In a letter response. DiPierro informed Marchi: "since you communicated these messages in your capacity as a BOCES teacher, and in as much as parents are part of the instructional process, my interpretation of the agreement you signed … precludes you from communicating in this manner." No action was taken against Marchi in connection with this incident.

In the summer following the 1995–1996 school year, Marchi filed this section 1983 action, alleging that (1) BOCES violated his rights to academic freedom, free association, free speech, and free exercise of religion, as well as his rights under the Religious Freedom Restoration Act, by suspending him in 1995; (2) BOCES violated his right to due process and retaliat-

ed against him by assigning him to teach a CDS class upon his return to teaching; (3) the directive is unconstitutionally vague and overbroad; and (4) the directive had been applied to proscribe protected speech between Marchi and students' parents. Marchi sought a preliminary injunction to enjoin BOCES from enforcing the directive; the District Court denied the request.

Subsequently, BOCES moved for summary judgment. After discovery was completed, Marchi cross-moved for summary judgment and sought leave to amend his complaint in order to expand his allegations relating to the directive's purported overbreadth and chilling of protected speech. The proposed amended complaint included allegations that BOCES violated Marchi's First Amendment rights by interpreting the directive to constrain Marchi with respect to his communications with students on matters not related to school curriculum both on and off school grounds during non-class times. Marchi contended that the deposition testimony of Daly, the author of the directive, demonstrated that BOCES intended to apply the directive to curtail these forms of allegedly protected speech.

During his deposition, Daly had been asked a number of questions relating to the meaning of the term "instructional program," as it is used in the directive. In response to the question whether the term covers an on-campus conversation during school hours, but outside the classroom, between a teacher and students on matters unrelated to the school curriculum, Daly stated, "I believe it does, yes." Marchi's attorney then asked: "Again, assuming that Mr. Marchi and the student had a conversation ... not related to the curriculum, off of school grounds, out of school hours, is that part of Mr. Marchi's delivery of his instructional program?" Daly responded: "Well, in my own personal opinion, given the influence that teachers have, I believe that a teacher's influence is ex-

tended often beyond the parameters of the school day."

The District Court granted BOCES's summary judgment motion and denied Marchi's request for leave to amend his complaint. Because Marchi challenges only the dismissal of his claim that the directive is unconstitutionally vague and overbroad and the denial of his motion for leave to amend his complaint, we limit our summary of the District Court's decision to those rulings.

Noting that "thousands of teachers of common intelligence are able to distinguish between their instructional program and their personal life and do so without violating the establishment clause," the District Court concluded that the directive was not vague. With respect to its alleged overbreadth, the District Court found that the directive "addresses only [Marchi's] instructional program and no other aspect of [his] personal life" and that "[h]ow [BOCES] might interpret the directive is not relevant to whether the directive is constitutional on its face." Accordingly, the District Court dismissed Marchi's facial challenge and denied his request for leave to add a related claim. Turning to the other allegations of the proposed amended complaint, the District Court held that Marchi's concerns regarding his inability to discuss religion with his students in any context for fear of violating the directive were not ripe for litigation because Marchi had failed to demonstrate a credible fear that BOCES might enforce the directive in an unconstitutional manner.

### Discussion

On appeal, Marchi contends that the directive is unconstitutional as applied to three forms of communication and that the directive is facially invalid because it is vague. We review the District Court's grant of summary judgment *de novo, see Heilweil v. Mount Sinai Hospital*, 32 F.3d 718, 721 (2d Cir.1994), and its denial of Marchi's motion for leave to amend his

complaint for an abuse of discretion, *see Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir.1993). It will be convenient to consider first Marchi's "as applied" challenge to the directive.

## I. Constitutionality of the Directive as Applied

Marchi contends that the directive is unconstitutional as applied to (1) his use of religious phrases in his communications with parents of students, namely, his letter to Ryan Czech's father; (2) his responses to personal questions and requests for prayer raised by students off school grounds; and (3) his responses to such questions and requests raised by students outside of class but on school grounds. BOCES has stated officially that it considers the first form of communication to violate the directive. It has not, however, done so with respect to the latter two forms of expression.

The directive is unquestionably a restraint on Marchi's First Amendment rights. However, not all restraints on free exercise and free speech rights are invalid. Frequently, the validity of a particular restraint depends on the context in which the expression occurs. And, as the Supreme Court has repeatedly emphasized, the special nature of public educational institutions gives rise to "the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools." *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 507, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) (citations omitted). Of particular relevance to this appeal, the Court has noted that "the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgement of free speech otherwise protected by the First Amendment." *Lamb's Chapel v. Center Moriches Union Free School District*, 508 U.S. 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (quoting *Widmar v. Vincent*, 454 U.S. 263, 271, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)).

■ Our Establishment Clause jurisprudence provides that, in addition to having a secular purpose and not having the primary effect of advancing or hindering religion, state policies or actions must not foster excessive government entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Although the *Lemon* test has been criticized, it has not been overruled. However, the Court appears to have modified the test somewhat in *Agostini v. Felton*, 521 U.S. 203, 234, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997), which instructs us to focus on the question of whether the challenged action can reasonably be viewed as a governmental endorsement of religion. Under this jurisprudence, courts have not only struck down school-sponsored religious activities and official endorsement of religion, *see, e.g., Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (prayer at graduation ceremony); *Wallace v. Jaffree*, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (moment of silence), but they have also held that public school officials have the authority to prevent teachers from giving students and others the impression that the school prefers a particular religion, or religion in general, *see, e.g., Helland v. South Bend Community School Corp.*, 93 F.3d 327 (7th Cir.1996); *Peloza v. Capistrano Unified School District*, 37 F.3d 517 (9th Cir.1994). Thus, schools may direct teachers to "refrain from expression of religious viewpoints in the classroom and like settings," *Bishop v. Aronov*, 926 F.2d 1066, 1077 (11th Cir.1991); indeed, schools have a constitutional duty to make "certain . . . that subsidized teachers do not inculcate religion," *Lemon*, 403 U.S. at 619, 91 S.Ct. 2105.

■ The establishment-of-religion principles of *Lemon* and *Agostini*, combined with the free-exercise principles of *Lamb's Chapel*, provide the framework for considering the specific claims raised on

this appeal. These decisions reveal two important aspects of the Supreme Court's religion-clauses jurisprudence. First, when courts adjudicate claims that some governmental activity violates the Establishment Clause, they must be careful not to invalidate activity that has a primary secular purpose and effect and only incidental religious significance. Second, when government endeavors to police itself and its employees in an effort to avoid transgressing Establishment Clause limits, it must be accorded some leeway, even though the conduct it forbids might not inevitably be determined to violate the Establishment Clause and the limitations it imposes might restrict an individual's conduct that might well be protected by the Free Exercise Clause if the individual were not acting as an agent of government. *Cf. Waters v. Churchill*, 511 U.S. 661, 671, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion) (Government has "freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large[.]"); *id.* at 671–75, 114 S.Ct. 1878.

■ The decisions governmental agencies make in determining when they are at risk of Establishment Clause violations are difficult, and, in dealing with their employees, they cannot be expected to resolve so precisely the inevitable tensions between the Establishment Clause and the Free Exercise Clause that they may forbid only employee conduct that, if occurring, would violate the Establishment Clause and must tolerate all employee conduct that, if prohibited as to non-employees, would violate the Free Exercise Clause. When government is both the initiator of some religiously related actions, through the conduct of its employees, and the regulator of the extent of such actions, through the conduct of its supervising employees, it need not determine, at the peril of legal liability, precisely where the line would be drawn if its employees were not involved. Though school boards, like all instrumentalities of government, must observe the basic free exercise rights of its employees, the scope of the employees' rights must sometimes yield to the legitimate interest of the governmental employer in avoiding litigation by those contending that an employee's desire to exercise his freedom of religion has propelled his employer into an Establishment Clause violation. In discharging its public functions, the governmental employer must be accorded some breathing space to regulate in this difficult context. For his part, the employee must accept that he does not retain the full extent of free exercise rights that he would enjoy as a private citizen.

Guided by these principles, we turn to the specific claims raised in this action.

## A. Communications with Parents

■ Marchi challenges BOCES's application of the directive to his communication with Mr. Czech, contending that a "letter thanking a friend who is a parent[ ] is private speech."

The circumstances surrounding Marchi's February 28, 1996, letter to Mr. Czech, however, demonstrate that Marchi wrote the letter in his capacity as a teacher. As a significant part of his duties as a CDS teacher, Marchi is responsible for behavior modification of the children in his class. Marchi's letter concerned an audiotape the father of a student had sent to a teacher for use in the son's class. Though the letter was no doubt sent primarily as merely a "thank you," it concerned what occurred in the classroom, commenting specifically on the effect the music had on Mr. Czech's son. Marchi testified during his deposition that he had used the tape—"Wee[1] Sing the Bible"—during his class and that it was "a very effective way of controlling Ryan, . . . not to mention the rest of the kids also." In writing Mr. Czech, Marchi was communicating with a student's parent on a matter directly related to his professional duties as a CDS teacher.

---

1. "Wee" is the trademark of a series of children's music tapes.

Although the letter was thus within the scope of the directive's coverage of "delivery of [Marchi's] instructional program," it is a closer question whether the letter's content was reasonably perceived by BOCES as within the scope of the directive's proscription of "references to religion." The directive bars "references to religion in the delivery of your instructional program unless it is a required element of a course of instruction" and has a supervisor's prior approval. The phrases of the letter arguably constituting "references to religion" were minimal. The closing—"May God Bless you all richly!"—is barely more of a "reference to religion" than the common "God bless you" offered to someone who has sneezed. Yet the first sentence of the letter contains two references with which BOCES was understandably concerned. For receiving the tape, Marchi thanked not only the student's father but also "the LORD," and he assessed the tape as bringing "the Spirit of Peace to the classroom." The latter reference, though perhaps intended to comment only on the calming influence of the tape's content, was reasonably perceived by BOCES as a reference to religion, especially in the context of the letter's other religiously related phrases.

■ Because BOCES has a strong, perhaps compelling, interest in avoiding Establishment Clause violations, *see Lamb's Chapel*, 508 U.S. at 394, 113 S.Ct. 2141, it may proscribe interactions between teachers and parents that risk giving the impression that the school endorses religion. A school risks violation of the Establishment Clause if any of its teachers' activities gives the impression that the school endorses religion. As the Ninth Circuit has stated:

> While at the high school, whether he is in the classroom or outside of it during contract time, [a public school teacher] is not just any ordinary citizen. He

is a teacher. . . . He is clothed with the mantle of one who imparts knowledge and wisdom. His expressions of opinion are all the more believable because he is a teacher. The likelihood of high school students equating his views with those of the school is substantial.

*Peloza*, 37 F.3d at 522. In the related context of school regulation of students' speech, the Supreme Court has held that a school may regulate "expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school." *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 271, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988).

Though Marchi's letter was slight in its references to religion, it sufficiently intruded religious content into a curricular matter, not involving a course in religion, such that the school authorities could reasonably be concerned that communications of this sort would expose it to non-frivolous Establishment Clause challenges. Therefore, BOCES's interpretation of the directive as prohibiting this conduct does not impermissibly infringe Marchi's free exercise rights.[2]

Marchi's claim that he was not aware that a letter of this sort would fall within his instructional program is sufficiently answered by two circumstances. First, he was not penalized by BOCES for writing the letter. Second, he is now on notice that letters written to students' parents in his capacity as a teacher are part of his instructional program.

### B. Off–Campus Expression

■ Based on the deposition testimony of Daly, Marchi requested leave to amend his complaint to allege that BOCES's interpretation of the directive as applying to off-campus discussions with students on matters not related to the curriculum, as well as his responses to

---

**2.** To the extent that Marchi seeks to challenge the regulation of his communications with students' parents on matters *unrelated* to

school, Marchi has failed even to allege that BOCES has attempted to regulate such communications.

478

students' requests for prayers, has chilled his protected expression. Although leave to amend is usually freely granted, it may be denied within the trial court's discretion where the proposed amendment would be futile. *See Ruffolo*, 987 F.2d at 131.

Article III of the Constitution limits the jurisdiction of federal courts to cases or controversies. A hypothetical or abstract dispute does not present a case or controversy: "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality" to justify judicial resolution. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 85 L.Ed. 826 (1941). It is Marchi's burden to allege facts demonstrating that the case presents a justiciable controversy. *See Renne v. Geary*, 501 U.S. 312, 316, 111 S.Ct. 2331, 115 L.Ed.2d 288 (1991).

For a case to be deemed justiciable under Article III, it must be ripe. *See Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Indeed, ripeness is a "constitutional prerequisite to exercise of jurisdiction by federal courts." *Federal Election Commission v. Central Long Island Tax Reform Immediately Committee*, 616 F.2d 45, 51 (2d Cir.1980) (citation omitted). Where a party seeks to challenge a statute or policy prior to its enforcement, the ripeness doctrine requires that the challenge grow out of a "real, substantial controversy between parties" involving a "dispute definite and concrete." *Babbitt v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (citation omitted). This requirement is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Abbott*, 387 U.S. at 148, 87 S.Ct. 1507.

The Supreme Court has instructed that the ripeness inquiry requires courts to consider both the fitness of the issues for judicial decision and the hardship resulting from withholding judicial consideration. *See id.* at 149, 87 S.Ct. 1507.

In this case, Marchi challenges all applications of the directive to his off-campus communications with students on matters unrelated to the school curriculum. Given the unique circumstances of student-teacher relationships, it is easy to imagine a variety of circumstances that would fall within the challenged hypothetical application of the directive, some of which may be regulated constitutionally and others of which may not. For instance, if Marchi supervised students on a weekend field trip, or hosted an end-of-the-school-year celebration, restriction of Marchi's religious expression might be permissible in order to avoid an Establishment Clause violation. On the other hand, if Marchi happens to see some of his students after school in a non-school-related context, BOCES's interest in avoiding an Establishment Clause violation might not be implicated.

Since BOCES has not threatened to apply the directive to any of Marchi's off-campus expressive activities, a court entertaining Marchi's challenge would be forced to guess at how BOCES might apply the directive and to pronounce on the validity of numerous possible applications of the directive, all highly fact-specific and, as of yet, hypothetical. Such an open-ended and indefinite challenge is not well suited to judicial decision.

In assessing the possible hardship to the parties resulting from withholding judicial resolution, we ask whether the challenged action creates a direct and immediate dilemma for the parties. *See Abbott*, 387 U.S. at 152–53, 87 S.Ct. 1507. A plaintiff must show either prosecution pursuant to the challenged provision or that a sufficiently real and immediate threat of prosecution exists. *See Poe v. Ullman*,

367 U.S. 497, 503–08, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961). In order to avoid the chilling of protected speech, however, "governmental action may be subject to constitutional challenge even though it has only an indirect effect on the exercise of First Amendment rights." *Laird v. Tatum*, 408 U.S. 1, 12–13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). Even in this context, though, some credible fear of enforcement must exist. *See id.* at 13–14, 92 S.Ct. 2318.

Marchi has failed to demonstrate such a credible fear. The testimony of Daly on which he relies is both ambiguous and, significantly, qualified as Daly's "personal opinion." BOCES has never indicated that it intends to apply the directive to Marchi's off-campus expressive activities on matters unrelated to his teaching. Thus, withholding judicial decision in this instance is not likely to result in significant hardship for Marchi.

In sum, Marchi's proposed amendments relating to his off-campus expressive activities fail to present controversies ripe for judicial decision. Under these circumstances, the District Court did not exceed its discretion when it denied Marchi's request for leave to amend his complaint.

### C. On–Campus Expression

Marchi also contends that the District Court erred in ruling unripe his claim that the directive is unconstitutional as applied to his on-campus, after-class conversations with students on matters not related to the curriculum and to his responses to students' requests for prayer.

This proposed amended claim, like the one discussed above, poses a broad hypothetical question: Can the directive constitutionally be applied to limit Marchi's out-of-class, on-campus expressive activities? Again, a wide spectrum of expressive activity meets this description, and the answer to the question turns on the precise nature of the expressive activity. Because Marchi raises his claim hypothetically, a district court would be forced either to guess at how BOCES might apply the directive or to set the permissible parameters of the directive itself, in contravention of the rule against advisory opinions. Such a dispute is not well-suited to judicial review.

Likewise, Marchi has not demonstrated a credible fear that BOCES intends to enforce the directive in an impermissible manner. Though Daly testified that BOCES administrators had, in the past, "recommended" to Marchi that he not pray with students on school grounds, even in private, such a recommendation does not give rise to a justiciable controversy. The directive has not been applied to prohibit such prayer. Thus, to the extent that Marchi's proposed amended complaint seeks to challenge application of the directive to on-campus private prayer with students, the amendment would be futile because the claim is premature.

To the extent Marchi seeks to challenge application of the directive to other on-campus, out-of-class, discussions with students about religion, he has similarly failed to demonstrate a credible fear that BOCES intends to enforce the directive to such speech. Under these circumstances, any hardship Marchi may experience from the withholding of judicial resolution is not sufficient to demonstrate a ripe claim. The District Court did not exceed its discretion when it refused to grant Marchi's request for leave to amend.

### II. Facial Validity of the Directive

Marchi also contends that the directive is unconstitutionally vague on its face because "instructional program" is not defined and BOCES has refused to define it or to articulate standards for determining whether a particular activity falls within its definition.

When a plaintiff alleges that a law or policy violates the First Amendment on its face, he "must demonstrate that the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the

plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.' " *New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 101 L.Ed.2d 1 (1988) (citing *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)). Basic principles of due process assure that punishment should be imposed only if the defendant could reasonably be expected to have known that his conduct was proscribed. As the Supreme Court has held, a statute or policy is unconstitutionally vague if people of common intelligence must guess at its meaning and may differ as to its application. *See Grayned v. Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Additionally, in order to prevent arbitrary and discriminatory enforcement, a law must provide sufficient standards to guide its application. *See id.* And, "[w]here a statute's literal scope ... is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Smith v. Goguen,* 415 U.S. 566, 573, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

In this case, the directive prohibits Marchi from "using any references to religion in the delivery of [his] instructional program unless it is a required element of a course of instruction ... and has prior approval by ... Dr. DiPierro." Though the key proscription—"references to religion"—will inevitably require interpretation in various circumstances, its basic meaning is as clear as the context permits, and, as a facial matter, gives Marchi fair notice of what conduct is proscribed.

Moreover, Marchi's assertion that BOCES has refused to provide any explanation of the term "instructional program" is belied by the record. In light of Marchi's history of intentionally violating the directive, it was not unreasonable for BOCES to view Marchi's initial request for clarification, which it received simultaneously with his signed affirmation agreeing to abide by the directive, as insincere.

More importantly, the record, including Marchi's own testimony, reveals that Marchi has received extensive guidance with regard to the directive's parameters since his return to teaching.

Aware that precise delineation of sanctionable conduct is close to impossible, courts have granted schools, acting in their capacity as employers, significant leeway. For example, in *Ward v. Hickey,* 996 F.2d 448 (1st Cir.1993), the First Circuit held that a school is not required to state expressly all types of objectionable conduct in order to place teachers on notice that some conduct is sanctionable. Rather, the Court held that the relevant inquiry is whether, "based on existing regulations, policies, discussions, and other forms of communication between school administration and teachers," it was "reasonable for the school to expect the teacher to know that her conduct was prohibited." *Id.* at 454.

BOCES is not obligated to articulate every imaginable situation that might fall within the directive's purview. *Cf. diLeo v. Greenfield,* 541 F.2d 949, 954 (2d Cir. 1976) (noting, on facial challenge to state teacher's termination statute, that "[a] saving construction is especially appropriate in an area such as discipline of teachers, where a myriad of uncontemplated situations may arise and it is not reasonable to require a legislature to elucidate in advance every act that requires sanction"). The language of the directive, which expressly limits its application to Marchi's instructional program, as well as the guidance Marchi has received, give Marchi sufficient notice of what conduct is proscribed by the directive. In sum, the directive is constitutional. It is neither facially vague nor overbroad.

### Conclusion

For the foregoing reasons, the judgment of the District Court is affirmed.